UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
MARY JANE TERRELL,

                Plaintiff,

    -against-

NATIONAL FILM BOARD OF CANADA,

                Defendant.
------------------------------------------------------------------ X

ECF CASE

**COMPLAINT**

**JURY DEMAND**

Civil Action No.:

05CV2723(LAP)

      Mary Jane Terrell, by her attorneys, Wechsler & Cohen, LLP, as and for her Complaint, alleges upon information and belief as follows:

      1.     Mary Jane Terrell ("Terrell") is currently a resident and, pursuant to 28 U.S.C. §1332, a citizen of the State of New York, residing at 370 Central Park West, Apartment 303, New York, New York, 10025.

      2.     Defendant, the National Film Board of Canada (the "NFBC"), is a Canadian public agency established pursuant to Section 4 of the National Film Act (R.S., C. N-8). The NFBC is subject to legal proceedings pursuant to Section 10(2) of the National Film Act, and for purposes of this lawsuit, may be treated as if it were "a corporation that is not an agent of Her Majesty." The NFBC's operational headquarters and principal place of business is 3155 Cote de Liesse, Ville St-Laurent, Quebec, H4N 2N4, Canada. For purposes of diversity jurisdiction under 28 U.S.C. §1332, the NFBC is a citizen of Canada.

      3.     The matter in controversy exceeds, exclusive of interest and costs, the sums specified by 28 U.S.C. § 1132. Jurisdiction in this Court also arises under 28 U.S.C §1331 by virtue of Terrell's claim pursuant to 29 U.S.C. § 1001 *et seq*. Supplemental jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1367.

## BACKGROUND FACTS

4. At all relevant times herein, Terrell was employed in the County, City, and State of New York, most recently at 350 Fifth Avenue, Suite 4820, New York, New York.

5. Terrell is a highly experienced professional television sales representative, and up and through the date of her unlawful termination by the NFBC on October 4, 2002, remained a highly respected veteran member of the NFBC's staff.

6. Terrell, a sixty-two year old female, began her working career with the NFBC on July 1, 1976. Terrell spent nearly three decades building a career at the NFBC, rising from the position of film librarian to that of U.S. Senior Marketing Representative, Television.

7. As a U.S. Senior Marketing Representative, Terrell was responsible for marketing NFBC films to U.S. television networks, negotiating license fees, and package-producing films for sale to U.S. television networks.

8. On September 4, 2002, Terrell was given notice that her employment with the NFBC would terminate as early as October 4, 2002, only nineteen months prior to the time at which Terrell would be eligible to retire with full retirement benefits.

9. The NFBC informed Terrell that her employment was to be terminated because the NFBC was restructuring its organization and Terrell's position had been "abolished."[1] The NFBC labeled Terrell as a "surplus employee."[2] Terrell was never offered any other job or role with the NFBC.

---

[1] *See* copy of January 10, 2002 memorandum authored by the NFBC's Guy Gauthier, Director of Human Resources annexed hereto as Exhibit "A."

[2] *See* copy of September 4, 2002 NFBC Memorandum from Johanne St-Arnauld ("St-Arnauld"), Director of Distribution for the NFBC, to Terrell annexed hereto as Exhibit "B."

10. Contrary to its claims that Terrell's position was being abolished, however, the NFBC promptly hired Christina J. Rogers ("Rogers"), an employee nearly thirty years her minor, to assume the responsibility for U.S. Television Sales, albeit with the marginal additional task of Television Sales for Latin America. Terrell was never offered the opportunity to take on this extra responsibility and Rogers' current position was never advertised within or outside of the NFBC, as is the usual practice.

11. Rogers was, upon information and belief, twenty-nine years of age when she assumed Terrell's position at the NFBC. Rogers is, upon information and belief, a close friend of Heather Wyer ("Wyer"), Terrell's then newly-hired direct superior, who was, at the time of Terrell's termination, in her early thirties.

12. On September 13, 2002, St-Arnauld, Director of Distribution for the NFBC, wrote and distributed an email to all employees simultaneously announcing Terrell's departure and saying that Rogers would be assuming the responsibility for Television Sales in the U.S. and Latin America. *See* Exhibit "C" annexed hereto.

13. Upon information and belief, promptly after Terrell's termination, Rogers reviewed much of Terrell's activity reports, including pertinent e-mails, and began contacting each of the U.S. Television clients to whom, on behalf of the NFBC, Terrell had historically licensed programs. In response to an inquiry from at least one client, American Public Television, Rogers stated that she was "replacing" Terrell. Moreover, Terrell regularly attended the MIPCOM conference, an international television conference that takes place annually in Cannes, France. Rogers attended the MIPCOM conference in Terrell's place and stead.

14. Also, upon information and belief, five of the seven older Television Sales Representatives employed by the NFBC have been terminated and replaced by younger employees or, in the case of Canadian union-member employees, shifted to other positions not involved in Television Sales and replaced by younger employees. One of the remaining employees, Mr. James Roberts, applied for and accepted a position in a different department of his own volition. The other employee, who works in France, was given substantial additional responsibilities in the non-theatrical market and saw her most lucrative television clients reassigned to a newly-hired thirty-two year old. Upon information and belief, this last employee was also asked not to appear, as she did annually, at the MIPCOM conference.

15. Based on the foregoing, Terrell saw reason to believe that her termination was not a result of her position being "abolished", but rather that she was replaced by Rogers due to her age. The NFBC was experiencing a downturn in marketable product and revenue and embraced a strategy of "out with the old, in with the young" as part of its restructuring of the Television Sales division.

16. Terrell informed the NFBC that she believed her termination had been age-based and asked that she be allowed to remain an employee for another seven months so as to avoid an early retirement penalty and, concomitantly, the approximate $219 per month penalty to her pension. The NFBC denied her allegation and refused to rectify the situation.[3]

17. After Terrell filed an age discrimination complaint with the Equal Employment Opportunity Commission claiming that her position had not in fact been "abolished", the NFBC amended its position, saying Terrell's "poor job performance" justified her termination.

---

[3] Terrell, however, did receive severance pay and a cash payment in lieu of notice of lay off in accordance with the NFBC's employment policy, plan, and/or practice.

18.     However, Terrell's performance year after year was unquestionably exemplary. Terrell initiated many breakthrough revenue-generating projects for the NFBC and found innovative ways to package and adapt the NFBC's films for marketing to U.S. television networks. Terrell's many accomplishments during her tenure at the NFBC include, but are not limited to, the following:

> ▪ Licensing an animation package to the Cartoon Network for the highest per minute fee that was ever paid in the U.S. for NFBC animation, garnering a total licensing fee of $1,106,000;
>
> ▪ Licensing a documentary to HBO for the highest fee ever negotiated for an NFBC film sold to a U.S. television network;
>
> ▪ Creating a new market for NFBC films by producing film discussion guides used at business meetings and corporate training sessions. This "found-money" market is still producing revenue for the NFBC years after its inception;
>
> ▪ Package-producing a two-hour animation special of NFBC short films for sale to the A&E  network. (This program continues to be one of the NFBC's top sellers in video);
>
> ▪ Package-producing a six-part series hosted by Colleen Dewhurst that generated revenue when very few U.S.-marketable programs were being produced by the NFBC; and
>
> ▪ Upon information and belief, generating more revenue for the NFBC than any other person in its history.

19.     Moreover, the NFBC's own Performance Appraisal Reports ("PARs") written by Terrell's supervisor at the NFBC confirm her experience and skill, stating that her "solid knowledge of NFBC collection and strengths results in creative positioning of programming,"[4] and noting her ability to perform despite unfavorable conditions. More to point, during fiscal years 2000-2001 and 2001-2002, the PARs repeatedly acknowledged that the NFBC had produced few marketable programs for U.S. television and the market as a whole was in decline.

---

[4] See Exhibit "D" annexed hereto.

Thus, the NFBC's "poor performer" argument is completely misleading and unwarranted. For example, in the PAR of 2000-2001:

▪ "There were few marketable new releases;" and

▪ "[Terrell] continued to gather important client data, meet with her established clients and seek out new ones although she had few new marketable productions to offer. She recognizes the importance of long term relationships and will be in a good position to generate revenues when saleable new product is made available."

And in the PAR of 2001-2002:

▪ "Not only did NFBC release little new high-profile product to meet the ratings-driven U.S. marketplace, the events of September 11th caused a major upheaval in the programming and buying priorities of U.S. media;"[5] and

▪ "Despite the general dearth of new product, Mary Jane concluded two significant contracts with key NFBC clients, the Sundance Channel and Discovery Health. The contract with DH (which Ms. Terrell brokered and negotiated) saw the first-time collaboration with NFBC production to produce a cut down version of "Slippery Blisses." "What's in a Kiss" was tailor-made for this U.S. specialty channel and the mutually satisfying experience may encourage collaboration on other projects and a clearer understanding by NFBC of U.S. market-driven needs."

20. Terrell was an exemplary and loyal employee whose more than twenty-five years of experience and creative marketing ideas earned the NFBC millions of dollars in revenue. The NFBC apparently considered her a valuable employee, as it retained and promoted her through six prior restructurings, including one in which Terrell was the only person not terminated out of a staff of thirteen. Indeed, Terrell was never once warned about poor performance leading up to her termination. Instead, in an E-mail announcing Terrell's departure, St.-Arnauld offered her "warmest appreciation for all of [Terrell's] hard work during her NFB career," *See* Exhibit "C" hereto. The NFBC's purported "business decision" justification for Terrell's termination is

---

[5] *See* copy of Terrell's 2001-2002 PAR annexed hereto as Exhibit "E."

simply a pretext for its unlawfully age-based discriminatory conduct.

## **FIRST CAUSE OF ACTION**

21.  Terrell repeats and realleges the allegations contained in paragraphs "1" through "20" hereof as if fully set forth at length herein.

22.  On December 9, 2004, Terrell received a Dismissal and Notice of Rights dated December 7, 2004 (the "Notice") from the EEOC affording Terrell with a right to sue under federal, state, and/or local law. (*See*, copy of EEOC Dismissal and Notice of Rights annexed hereto and incorporated herein by reference as Exhibit "F.")

23.  This lawsuit is being timely filed within 90 days of receipt of the Notice.

24.  The acts committed by the NFBC as set forth at length in paragraphs "1" through "20" of the Complaint, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Terrell based on her age in violation of New York Executive Law §296(1)(a) (the "New York Human Rights Law").

25.  Terrell, a person over age forty, is a member of a protected class.

26.  The acts which Terrell complains of herein supporting her claims for age discrimination took place as a result of her membership in a protected class and all took place while she was an employee of the NFBC and in the course of her employment with the NFBC.

27.  The acts and conduct complained of herein supporting Terrell's claims for age discrimination were committed by NFBC personnel, including but not limited to St.-Arnauld, who possessed and maintained supervisory authority over Terrell, and for whose acts the NFBC is liable.

28.     The acts and conduct complained of herein supporting Terrell's claims for age discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of Terrell's employment, including without limitation her ultimate discharge from the NFBC.

29.     As a direct and proximate result of the NFBC's conduct, Terrell has suffered and will continue to suffer from, among other things, a significant loss of income benefits as well as other losses associated with the effects of the NFBC's conduct upon Terrell's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of her life and will prevent her from functioning as she did prior to the conduct complained of herein.

30.     The discriminatory conduct of the NFBC so degraded Terrell physically, mentally, and emotionally that, as a proximate result of the violation by the NFBC of her civil rights, Terrell has suffered, and will continue to suffer, among other things, mental and emotional injuries.

31.     As direct and proximate result of the NFBC's violation of Terrell's rights under the New York Human Rights Law, the NFBC is liable to Terrell for compensatory damages pursuant to §297(4)(c)(iii) of the New York Human Rights Law in the sum of $2,000,000.

32.     Terrell therefore seeks judgment against the NFBC on the First Cause of Action in the sum of $2,000,000 for compensatory damages, together with costs, disbursements, and attorneys' fees.

## SECOND CAUSE OF ACTION

33.     Terrell repeats and realleges the allegations contained in paragraphs "1" through "32" hereof as if fully set forth at length herein.

34. The acts committed by the NFBC as set forth at length in paragraphs "1" through "20" of the Complaint, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Terrell based on her age in violation of New York City Administrative Code, Title 8, Chapter 1, §8-107(1)(a) (the "New York City Administrative Code").

35. Terrell, a person over age forty, is a member of a protected class.

36. The acts of which Terrell complains of herein supporting her claims for age discrimination took place as a result of her membership in a protected class and all took place while she was an employee of the NFBC and in the course of her employment with the NFBC.

37. The acts and conduct complained of herein supporting Terrell's claims for age discrimination were committed by NFBC personnel, including but not limited to St.-Arnauld, who possessed and maintained supervisory authority over Terrell, and for whose acts the NFBC is liable.

38. The acts and conduct complained of herein supporting Terrell's claims for age discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of Terrell's employment, including without limitation her ultimate discharge from the NFBC.

39. As a direct and proximate result of the NFBC's conduct, Terrell has suffered and will continue to suffer from, among other things, a significant loss of income benefits as well as other losses associated with the effects of the NFBC's conduct upon Terrell's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of her life and will prevent her from functioning as she did prior to the conduct complained of herein.

40. The discriminatory conduct of the NFBC so degraded Terrell physically, mentally, and emotionally that, as a proximate result of the violation by the NFBC of her civil rights, Terrell has suffered, and will continue to suffer, among other things, mental and emotional injuries.

41. Further, the discriminatory practices engaged in by the NFBC were done with malice and/or reckless indifference to Terrell's protected rights, such that, in addition to all the measures of relief cited herein to which Terrell is entitled, the NFBC should be required to pay punitive damages as punishment for its vile, indecent, and reprehensible conduct, in order to deter the NFBC and others similarly situated from such conduct in the future.

42. As direct and proximate result of the NFBC's violation of Terrell's rights under the New York City Administrative Code, the NFBC is liable to Terrell for compensatory damages in the sum of $2,000,000 and punitive damages in the sum of $5,000,000 pursuant to the New York City Administrative Code §8-502(a).

43. As direct and proximate result of the NFBC's violation of Terrell's rights under the New York City Administrative Code, the NFBC is further liable to Terrell for attorneys' fees pursuant to the New York City Administrative Code §8-502(f).

44. Terrell therefore seeks judgment against the NFBC on the Second Cause of Action for in the sum of $2,000,000 and punitive damages in the sum of $5,000,000, together with costs, disbursements, and attorneys' fees.

### THIRD CAUSE OF ACTION

45. Terrell repeats and realleges the allegations contained in paragraphs "1" through "44" hereof as if fully set forth at length herein.

46. The Employee Retirement Income Securities Act of 1974 ("ERISA"), 29 U.S.C. §1000 *et seq.*, defines "employee welfare benefit plan" as "any plan, fund, or program . . . established or maintained . . . by an employer or by an employee organization, or by both . . . for the purpose of providing for participants or their beneficiaries."  29 U.S.C. §1002(1).

47. The NFBC maintained a pension plan, practice, and/or policy during Terrell's employment, that constitutes an employee benefit plan under the Employee Retirement Income Securities Act of 1974 ("ERISA"), 29 U.S.C. §1000 *et seq.*

48. Upon information and belief the NFBC consistently paid pension benefits to its former employees, according to a formula, in the past.

49. Upon information and belief, the pension payments due Terrell were or are either allocated by the NFBC to a special fund and/or the NFBC general fund, each of which fall within the protections of ERISA's coverage.

50. The source of financing and the procedures for receiving benefits under the NFBC's pension plan were and are determinable by a reasonable person.

51. Terrell was an intended beneficiary or a member of the class of intended beneficiaries of the NFBC's pension plan.

52. Under ERISA, because the NFBC terminated Terrell's employment, Terrell is entitled to pension benefits pursuant to the most favorable pension arrangement applicable to her, which the NFBC improperly and unlawfully withheld.

53. Pursuant 29 U.S.C. §1132(g)(1), Terrell is entitled to reasonable attorneys' fees and costs in an action to recover benefits, including pension benefits.

54. The Court should direct the NFBC to pay Terrell pension benefits in the amount of $79,200, together with interest and attorneys' fees.

WHEREFORE, Terrell demands judgment against the NFBC on the First Cause of Action in an amount not less than $2,000,000 for compensatory damages; and on the Second Cause of Action in an amount not less than $2,000,000 in compensatory damages and $5,000,000 in punitive damages, together with front pay, back pay, interest on back pay, and attorneys' fees, as permitted by law, and on the Third Cause of Action for $79,200, and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
       March 9, 2005

                    WECHSLER & COHEN, LLP

By: _____/s/_____
David B. Wechsler (DBW6116)
Marc O. Sheridan (MOS4753)
*Attorneys for Plaintiff*
116 John Street, 33rd Floor
New York, New York 10038
(212) 847-7900